IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| WESTERN INSULATION, L.P.,<br><br>                               Plaintiff,<br><br>          v.<br><br>HAL MOORE<br><br>  and<br><br>MELANIE MOORE,<br><br>                               Defendants. | Civil Action Number 3:05CV602-JRS |

**MEMORANDUM OPINION**

THIS MATTER comes before the Court on Plaintiff Western Insulation, L.P.'s ("Western") Motion for Partial Summary Judgment, as well as Defendant Melanie Moore's Cross-Motion for Partial Summary Judgment on the First Cause of Action for Breach of Contract. For the reasons discussed herein, both Motions are DENIED.

**I.  BACKGROUND**

On or about March 1, 2001, Western purchased Western Insulation, Inc.,[1] an insulation business with operations in California and a small section of Arizona, from Hal Moore for $41,990,000. Pursuant to the Contribution and Sale Agreement (the "Sale Agreement"), Western Insulation, Inc. transferred its company assets, accounts, customers, employees, trade secrets, proprietary information, and good will to Western. Both Hal and his wife, Melanie Moore (collectively, "the Moores"), signed separate

---

[1] "Western" refers to Plaintiff Western Insulation, L.P., and "Western Insulation, Inc." refers to the entity that Hal Moore sold in 2001.

Confidentiality, Non-Competition, and Non-Solicitation Agreements (the "Restrictive Covenants") on March 12, 2001. The Restrictive Covenants provide, in relevant part:

> As consideration for and to induce [Western] to pay the consideration set forth in the Contribution and Sale Agreement, Moore hereby covenants and agrees that except as [Western] may expressly authorize or direct in writing, he *shall not for a period of seven (7) years from the date hereof* (the "Non-Compete Period"), *directly or indirectly, (a) own, manage, operate, join or control (or participate in the ownership, management, operation or control of) any corporation, company, association, partnership, limited liability company, proprietorship or other business entity or enterprise that, within the restricted territories* identified on Schedule A attached hereto and incorporated herein (the "Restricted Territories"), which are the territories in which . . . [Western Insulation, Inc.] conducted business immediately prior to the transactions set forth in the Contribution and Sale Agreement, engages in the business of selling, distributing or installing Restricted Products (as hereinafter defined) or (b) serve as an employee, agent, consultant, officer, director or representative of any such business entity or enterprise described immediately above in clause (a) . . . . For the purposes of this Agreement, "Restricted Products" shall mean: (i) fiberglass, building insulation, fiberglass loosefill insulation, mineral wood insulation, cellulose insulation, foam insulation; (ii) weatherstripping, water heater blankets; (iii) shower restrictors, shower and tub enclosures, closet shelving organizers, vanity mirrors, closet doors; and (iv) any other products sold, distributed or installed by . . . [Western Insulation, Inc.] prior to the date hereof.

Confidentiality, Non-Competition, and Non-Solicitation Agreement § 2(A) (emphasis added). The restricted area includes "[e]ach and every county in the State of California" and "[a] one hundred twenty-five (125) mile . . . radius of . . . [Western Insulation, Inc.'s location] in Phoenix, Arizona." Schedule A to Id.

Hal Moore still owns the San Diego, California, building (the "Miralani Drive building") out of which Western Insulation, Inc. was headquartered and operated when Hal Moore owned that business. After Western purchased Western Insulation, Inc., Western operated out of the Miralani Drive building for roughly three years, between March 2001 and March 2004. Two companies owned by the Moores, Great Western Drywall and North County Acoustics, are currently operating out of the Miralani Drive building.

In June 2004, a former employee of Hal Moore at Western Insulation, Inc., Stephanie Schulkamp, formed American Insulation, Inc. ("American Insulation") in California. American Insulation operates in many of the counties that are identified as restricted territories in the Restrictive Covenants and has the same nature of business as Western—i.e., the sale, distribution, and installation of insulation. When American Insulation was created, Ms. Schulkamp was serving as the Chief Operations Officer of Great Western Drywall (one of the companies owned by the Moores); she served in that capacity between March 2003 and March 2005. Also during that two-year period, Ms. Schulkamp oversaw the day-to-day operations of two other companies owned by the Moores—North County Acoustics and State Insulation.

Towards the end of Ms. Schulkamp's service as Great Western Drywall's Chief Operations Officer—between the months of January and March 2005—the Moores allegedly began to discuss with Ms. Schulkamp certain details relating to the start-up of American Insulation's operations. On March 1, 2005, Hal Moore and Ms. Schulkamp signed a lease agreement for the lease of 11,710 square feet of office and warehouse space and a related parking area for three years to American Insulation in Hal Moore's Miralani Drive building. This equated to roughly the same amount of space that Western Insulation, Inc. used when it was operating out of that building, and approximately the same amount of space that Western used when it was temporarily operating out of the Miralani Drive building.

American Insulation is now sharing nearly half of the office and warehouse space in the Miralani Drive building with Great Western Drywall and North County Acoustics, both owned by the Moores. American Insulation is also connected to the same voice mail system used by Great Western Drywall and North County Acoustics. Under the terms of its lease, American Insulation pays $5,000 per month to Hal Moore for 11,710 square feet of space. This, Western contends, is a more favorable

lease arrangement than Western's lease terms, which required a monthly payment of approximately $14,100 for 23,500 square feet of space in the same building.

Hal Moore, through another company he owns, State Drywall, Inc., is also leasing two pickup trucks to American Insulation, pursuant to a lease agreement entered into on the same day as American Insulation's agreement to lease space in the Miralani Drive building. These two trucks are the only vehicles used by American Insulation for insulation installation. Ms. Schulkamp became aware of these two vehicles because of her role as the Chief Operations Officer of Great Western Drywall.

The nature of Melanie Moore's participation in her husband's businesses, including Western Insulation, Inc., and her role in assisting Ms. Schulkamp to commence operations with American Insulation are less clear. Most of the relevant facts relate to Melanie Moore's decision to co-sign and guarantee a loan for American Insulation. When Ms. Schulkamp was having trouble securing a loan from City National Bank to fund American Insulation's start-up costs, Melanie Moore, who admits to being friends with Ms. Schulkamp, co-signed a loan application and agreed to personally guarantee Ms. Schulkamp's indebtedness to City National Bank for a highly substantial principal amount in March 2005.[2] Melanie Moore was the only outside guarantor on the loan to American Insulation.

Under the Commercial Guarantee Agreement for American Insulation, City National Bank has the right to collect on Melanie Moore's guarantee without first attempting to collect from Ms.

---

[2] The precise amount of Melanie Moore's personal guarantee was revealed to the Court in Plaintiff's Redacted and Unredacted Memoranda in Opposition to Melanie Moore's Motion for Partial Summary Judgment. Because these Memoranda were filed under seal, however, the Court will not recite the specific amount. Several documents have been submitted under seal in this litigation pursuant to a Protective Order entered into by the parties to a pending lawsuit in a California state court. In the California case, Western had originally filed suit against Hal Moore, Melanie Moore, Stephanie Schulkamp, and American Insulation. The parties in that action consented to dismiss Hal and Melanie Moore, provided that Western could re-file against them in Virginia based on a consent to jurisdiction clause. All original parties to that action agreed to abide by the Protective Order such that, should any protected documents be submitted to any court, they would be submitted under seal.

Schulkamp or foreclosing on the property pledged by Ms. Schulkamp. Melanie Moore also agreed that City National Bank could seek recourse against both her separate property and her community property. Melanie Moore was also granted certain rights as a result of her undertaking to serve as guarantor for the loan to American Insulation. These rights are provided for in a Loan Guaranty Agreement, an Option Agreement, a Pledge Agreement, a Security Agreement, and a Deed of Trust. Because these documents were filed under seal with Plaintiff's Motion for Leave to File a Supplemental Reply Brief, the Court will not discuss their provisions.

Pursuant to forum selection and choice of law provisions in the Restrictive Covenants, Western filed its Bill of Complaint in the Circuit Court for the County of Henrico, Virginia, on July 14, 2005. Naming Hal and Melanie Moore as co-defendants, the Bill of Complaint asserts six causes of action against the Moores. Defendants then removed this action to this Court. On October 11, 2005, Western filed the instant Motion for Partial Summary Judgment, requesting the Court to rule, as a matter of law, that the Moores are liable for breach of contract (Count One) by violating the terms of the Restrictive Covenants. On November 4, 2005, Melanie Moore filed her Cross-Motion for Partial Summary Judgment on the First Cause of Action for Breach of Contract.

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment can be granted only when "there is no genuine issue as to any material fact" and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987). Although the facts are construed in this manner, a court must inquire into "the genuineness and materiality of any purported factual issues." Ross v. Commc'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985) (emphasis in

original). Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The determination of the genuineness of an issue "calls for an examination of the entire record then before the court in the form of pleadings, depositions, answers to interrogatories, admissions on file and affidavits." Ross, 759 F.2d at 364. An issue is genuine "when the evidence . . . create[s] fair doubt; wholly speculative assertions will not suffice." Id. A motion for summary judgment cannot be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A cross-motion for summary judgment must be reviewed separately and on its own merits so that a court can "determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003); see also In re Vulcan Materials Co., 369 F. Supp. 2d 737, 740 (E.D. Va. 2005). As a court considers each individual motion, it "must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Rossignol, 316 F.3d at 523 (internal quotations and citations omitted).

### III.   WESTERN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**A.   Summary of the Parties' Arguments**

Western contends that the Restrictive Covenants are reasonable under Virginia law when one considers their geographic and temporal scope, as well as the scope of the restricted activities. Western further argues that the Moores violated the Restrictive Covenants by at least indirectly "participating" in a business of the same nature as Western within the restricted territories. Specifically, Western alleges that Hal Moore violated the Restrictive Covenant he signed by leasing real property and vehicles to American Insulation, which, like Western, is engaged in the insulation installation business in California. With regard to Melanie Moore, Western argues that, by co-signing and serving as the sole outside guarantor on City National Bank's loan to American Insulation, she has participated and

has a direct financial interest in the success of a competing business.[3]  Similarly, Western suggests that, because Melanie Moore's community property is at risk under the loan guarantee, Hal Moore, Melanie's husband, has an additional interest in American Insulation's success.  The gist of Western's arguments is that Hal and Melanie Moore have made "vital contributions" to American Insulation's competitive business and, as such, have breached the terms of the Restrictive Covenants.  Pl.'s Mem. Supp. Mot. Partial Summ. J. 14.

In his opposition to Western's Motion for Partial Summary Judgment, Hal Moore emphasizes that the burden for establishing the reasonableness of a covenant not to compete is on Western, as the plaintiff.  See Foti v. Cook 220 Va. 800, 805, 263 S.E.2d 430, 433 (Va. 1980).  While noting that no Virginia cases have expressly limited the maximum duration of a covenant not to compete in the context of a sale of a business, Hal Moore submits that the seven-year restriction at issue in this case is unreasonably long.  Likewise, Hal Moore argues that the geographic scope of the restrictions—covering the entire state of California and a small section of Arizona—is also excessive, and that Western has not proven that this restriction was tied to Western's legitimate business interests.

As an alternative argument, Hal Moore also claims that, even if the Court were to deem the Restrictive Covenant reasonable, he did not violate the terms of the agreement.  Relying, in part, on legal dictionary definitions for the terms "own," "manage," "operate," "join," "control," and "lease," he opines that the definitions for these terms do not overlap, and, as such, the actions prohibited in the Restrictive Covenants cannot be properly extended to cover the leasing of property.  See Black's Law Dictionary (6th ed. 1990).  With respect to case law authority, Hal Moore acknowledges the lack of

---

[3] Western references the Loan Guaranty Agreement, Option Agreement, Pledge Agreement, Security Agreement, and Deed of Trust (all filed under seal) as evidence that Melanie Moore has a certain level of control over the operation of American Insulation, as well as a direct financial interest in the success of that company.

Virginia case law precedent dealing directly with "the issue of whether the act of leasing real or personal property to a competitor constitutes the violation of a covenant not to compete given by the seller of a business to a buyer." Hal Moore's Mem. Opp'n Pl.'s Mot. Partial Summ. J. 8. He does, however, discuss several cases from other states tending to support the proposition that merely leasing property to a competitor does not violate a covenant not to compete. See id. at 8–11 (citing cases from Missouri, Florida, Washington, and Texas).

Finally, Hal Moore addresses Western's contentions concerning his alleged interest and stake in Melanie Moore's guarantee on American Insulation's debt to City National Bank. Despite his failure to fully adhere to the requirements of Local Civil Rule 56(B)[4] in outlining his stance on factual issues, Hal Moore does suggest to the Court the existence of at least one genuine issue of material fact. He explains that he never authorized any of his separate property or his interest in the community property he shared with Melanie Moore to be used in connection with Melanie Moore's guarantee on American Insulation's loan. On a related point, he further contends that, pursuant to a valid prenuptial agreement he has with Melanie Moore,[5] the proceeds of his sale of Western Insulation, Inc. remained his separate property after marriage. Hal Moore's arguments and factual representations suggest that the Moores'

---

[4] Local Civil Rule 56(B) requires "[a] brief in response to a motion for summary judgment . . . [to] include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated." E.D. Va. Loc. Civ. R. 56(B). Instead of including his factual assertions in his Memorandum in Opposition, Hal Moore filed separately a "Statement of Controverted Material Facts in Dispute" and a "Statement of Additional Undisputed Material Facts." The main purpose of this Rule, however, is to mandate the concession of facts which are not directly controverted by the non-moving party. Notwithstanding Hal Moore's failure to fully comply with Local Rule 56(B), the Court will consider the additional factual assertions offered in the separate filings.

[5] Of particular consequence for purposes of this Motion, neither party presented a copy of the Moores' prenuptial agreement to the Court in support of or in opposition to this Motion.

division of marital wealth and their respective interests in both their separate and community property are in dispute.

In a separate brief, Melanie Moore argues that the Restrictive Covenant she signed is unenforceable for lack of consideration and for being overly broad. As she contends, although Western paid Hal Moore $42 million for Western Insulation, Inc., the proceeds from that sale became Hal Moore's separate property pursuant to the prenuptial agreement—not hers. In characterizing the Restrictive Covenant as overly broad, Melanie Moore, unlike Hal Moore, urges the Court to apply Virginia's restrictive covenant jurisprudence relating specifically to the employment context, rather than the sale of a business context. Because she did not own the business being sold, Melanie Moore suggests that she signed the Restrictive Covenant as an employee agreeing not to work for competing businesses. Under that premise, Melanie Moore opines that the Restrictive Covenant is impermissibly broad as it bears on her opportunities for future employment.

Melanie Moore also explains that the prohibitions enumerated in the Restrictive Covenant did not expressly bar her from guaranteeing the loan to American Insulation. She avers that the primary purpose of the Restrictive Covenant she signed was to protect confidential information, proprietary information, and client relationships. By acting as an outside guarantor on the loan, she claims that she in no way violated these restrictions. Finally, because the Restrictive Covenant provides that she can own "1% or less of the publicly traded equity securities of any company," Melanie Moore states that she was not disallowed from having some degree of financial interest in another company. Confidentiality, Non-Competition, and Non-Solicitation Agreement § 2(A).

B.   Discussion

As a general rule, Virginia courts frown upon restrictive covenants constituting unfair restraints on trade. See, e.g., Modern Env'ts, Inc. v. Stinnett, 263 Va. 491, 493, 561 S.E.2d 694, 695 (Va. 2002).

The Court is obligated to note, however, the vast difference between restrictive covenants in employment agreements and restrictive covenants in the context of a sale of a business, particularly when sophisticated parties are involved. While a restrictive covenant "restrict[ing] [an] employee in the exercise of a gainful occupation" is disfavored and strictly construed against the employer, Richardson v. Paxton Co., 203 Va. 790, 795, 127 S.E.2d 113, 117 (Va. 1962), "the scope of permissible restrictions increases" when the sale of a business is involved. Roto-Die Co. v. Lesser, 899 F. Supp. 1515, 1519 (W.D. Va. 1995) (citing Id.). The standards are different, in part, because employees often have comparatively little bargaining power and less leverage for negotiating a fair deal. In contrast, when a business is sold, the transaction more typically involves sophisticated parties coming to an agreement after an arms-length negotiation process.

As the threshold issue, the Court must determine if the Restrictive Covenants entered into by the Moores are enforceable. In addressing this issue, courts in Virginia make a three-part inquiry into the reasonableness of: 1) the geographic scope of the restrictions; 2) the temporal scope of the restrictions; and 3) the scope of the restricted activities. See Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876 (Va. 1951). Because the case presently before this Court involves the sale of a business, the Court will apply the more lenient standard in analyzing the enforceability of the Restrictive Covenants.

In terms of geography, the restricted area in the Restrictive Covenants includes "[e]ach and every county in the State of California" and "[a] one hundred twenty-five (125) mile . . . radius of . . . [Western Insulation, Inc.'s location] in Phoenix, Arizona." Schedule A to Confidentiality, Non-Competition, and Non-Solicitation Agreement. Western Insulation, Inc., a growing $42 million business, operated in approximately half of the counties in California at the time of the sale, as well as Phoenix, Arizona. Western continues to do business in all of those places and advertises throughout California. See Supplemental Decl. Steve Heim Supp. Pl.'s Mot. Partial Summ. J. The Court views

this geographic scope as reasonable, justified, and relevant to protect Western's legitimate business interests.

With respect to the temporal scope of the restrictions, the parties all concede that Virginia has not articulated a maximum limitation on a restrictive covenant in the context of a sale of business. The Supreme Court of Virginia has provided some guidance, expressing, for example, no qualms over the reasonableness of a restrictive covenant with a five-year term. See Meissel v. Finley, 198 Va. 577, 582–83, 95 S.E.2d 186, 190–91 (Va. 1956). Notably, the restrictive covenant in the Meissel case was analyzed under heightened scrutiny in the context of an employment agreement. Given the absence of any Virginia cases holding to the contrary, the Court finds that, in the context of the sale of a business through an arms-length transaction, and provided that the geographic scope of the restrictions is relevant to the legitimate business expectations of the purchasing party, a seven-year non-compete period is reasonable. It is clear to the Court that the protection Western stood to gain by negotiating for a seven-year non-compete period was an integral factor in Western's decision to purchase Western Insulation, Inc. for $42 million. Western should be entitled to a benefit for which it gave substantial monetary consideration.

Finally, the Court must consider the scope of the restricted activities. The Restrictive Covenants signed by the Moores prevent them from:

> own[ing], manag[ing], operat[ing], join[ing] or control[ling] (or participat[ing] in the ownership, management, operation or control of) any corporation, company, association, partnership, limited liability company, proprietorship or other business entity or enterprise that . . . engages in the business of selling, distributing or installing Restricted Products . . . or . . . serv[ing] as an employee, agent, consultant, officer, director or representative of any such business entity or enterprise described . . . above.

Confidentiality, Non-Competition, and Non-Solicitation Agreement § 2(A). The "Restricted Products" include "fiberglass, building insulation, fiberglass loosefill insulation, mineral wood insulation, cellulose

11

insulation, foam insulation; . . . weatherstripping, water heater blankets; . . . shower restrictors, shower and tub enclosures, closet shelving organizers, vanity mirrors, closet doors; and . . . any other products sold, distributed or installed by . . . [Western Insulation, Inc.]" prior to the sale. Id. The relevant language effectively prohibits the Moores from owning or in some way assisting a business that engages in the same line of work as Western within the restricted territories. The scope of the restricted activities is, therefore, reasonable.

Finding that the Restrictive Covenants are reasonable and should be enforced,[6] the Court is faced with the issue of whether the Moores should be held liable for breach of contract. Western alleges that the Moores violated the Restrictive Covenants in three main ways: 1) Hal Moore's act of leasing American Installation office and warehouse space; 2) Hal Moore's act of leasing American Installation two trucks; and 3) Melanie Moore's act of co-signing and personally guaranteeing a large loan from National City Bank to American Insulation.

The Court's own research and the parties' briefs have not identified a single Virginia case that poses the same issues and was decided in the context of the sale of a business. In one fairly recent Supreme Court of Virginia case, however, the court held that a non-compete agreement had been violated

---

[6] In determining the enforceability of restrictive covenants, Virginia courts often apply a slightly different analysis, asking three questions: 1) Is the restraint, from the standpoint of the purchaser, reasonable in the sense that it is no greater than is necessary to protect the purchaser in some legitimate business interest?; 2) Is the restraint, from the standpoint of the seller, reasonable in the sense that it is not unduly harsh and oppressive in curtailing his or her legitimate efforts to earn a livelihood?; and 3) Is the restraint reasonable from a public policy standpoint? See, e.g., Meissel v. Finley, 198 Va. 577, 580, 95 S.E.2d 186, 188 (Va. 1956). This approach, however, is most commonly applied in the employer/employee restrictive covenant context. Even if applied here, the Court finds that the result would be the same. First, from Western's standpoint, and as discussed above, the restrictions were reasonably tied to Western's legitimate business interests. Second, from the Moores' standpoint, abiding by the Restrictive Covenants would not impose an undue hardship on them by curtailing their efforts to earn a livelihood. The Moores are multi-millionaires who own several businesses and actually reside in Nevada—outside of the restricted territories. Finally, public policy certainly supports enforcing these Restrictive Covenants which were entered into and negotiated by sophisticated parties represented by counsel.

when a husband provided indirect assistance to his wife in starting up an insurance business competing with his former employer (an insurance company). Rash v. Hilb, Rogal & Hamilton Co., 251 Va. 281, 467 S.E.2d 791 (Va. 1996). In Rash, the non-compete agreement prohibited Mr. Rash, the defendant, from, "directly or indirectly as an owner, stockholder, director, employee, partner, agent, broker, consultant or other participant, . . . . engag[ing] in any manner in any business competing directly or indirectly with [the former employer]." Id. at 285, 467 S.E.2d at 794. The court found that Mr. Rash's assistance to his wife included lending her his credit card to make purchases for the competing business, allowing her to use his automobile for business purposes, loaning her money for operating capital, and pledging the couple's jointly owned mutual funds as collateral for the business. Based on evidence of these actions, the court held that Mr. Rash, "at the very least, indirectly engaged in a business that competed against [his former employer." Id. at 286, 467 S.E.2d at 794.

The facts in Rash are reasonably analogous to the facts presently before the Court. Moreover, the Court's common-sense assessment of the Moores' actions juxtaposed with the express language of the Restrictive Covenants weighs towards a finding that both of the Moores, at a minimum, indirectly participated in American Insulation, a business in competition with Western. Based on the factual assertions by the parties and the evidence contained in the record, however, the Court cannot state, without hesitation, that no genuine issues of material fact exist.

As already mentioned, no party has presented the Moores' prenuptial agreement to the Court. It is not clear to the Court how long the Moores have resided in Nevada. Regardless, both California and Nevada are community property states. Importantly, though, both states allow for property acquired during a couple's marriage to remain separate property if expressly provided for in a premarital agreement. See, e.g., United States v. Elam, 112 F.3d 1036, 1038 (9th Cir. 1997) (citing Cal. Fam. Code § 850 and noting that California allows prenuptial agreements "to transmute

13

community property into separate property"); Nev. Rev. Stat. Ann. § 123.220 (2005) (explaining that, Under Nevada law, "[a]ll property . . . acquired after marriage by either husband or wife, or both, is community property unless . . . otherwise provided by . . . [a]n agreement in writing between the spouses"). The provisions and details contained in the Moores' prenuptial agreement—relevant to determining Hal Moore's interest in his wife's guarantee on American Insulation's loan and Melanie Moore's interest in the $42 million Hal Moore gained by selling Western Insulation, Inc.—remain unknown.

Also in dispute are the circumstances surrounding Melanie Moore's signing of the Restrictive Covenant. The parties have adopted different stances in characterizing Melanie Moore's role in her husband's former company, Western Insulation, Inc. The parties also dispute what benefit, if any, Melanie Moore derived from signing the Restrictive Covenant, which bears directly on the issue of consideration.

Having found that genuine issues of material fact exist, the Court must deny Western's Motion for Partial Summary Judgment as to both defendants.

### IV. MELANIE MOORE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

In her Cross-Motion, Melanie Moore restates many of the arguments voiced in her opposition to Western's Motion. She again contends that she gave no consideration for signing the Restrictive Covenant, adding that, from her perspective, there was no mutuality of obligations involved in the sale of Western Insulation, Inc., as required under Virginia law. See Miller v. SEVAMP, Inc., 234 Va. 462, 465 362 S.E.2d 915, 916–17 (Va. 1987). In response, Western argues that there was consideration, because the terms of the Sale Agreement reveal that Melanie Moore had the opportunity to enter into a Shareholder Employment, work for the sold company as an employee, and be indemnified against defined liabilities following the sale of Western Insulation, Inc.

What ultimately guides the Court in ruling on Melanie Moore's Cross-Motion is that the factual issues developed through the parties' briefing on Western's Motion necessarily carry over to a ruling on the Cross-Motion. Accordingly, Melanie Moore's Cross-Motion for Partial Summary Judgment will also be denied.

## V. CONCLUSION

For the reasons stated, Western's Motion for Partial Summary Judgment is hereby DENIED as to both defendants. Likewise, Melanie Moore's Cross-Motion for Partial Summary Judgment on the First Cause of Action for Breach of Contract is also hereby DENIED.

An appropriate Order shall issue.

ENTERED this   25th   day of January, 2006

/s/
James R. Spencer
UNITED STATES DISTRICT JUDGE